Good afternoon. May it please the Court, my name is Gail Ivins and I represent Defendant Appellant Tony Padilla in this matter. For evidence to be relevant, it must be probative of the proposition that is offered to prove. And the proposition to be proved must be one that is of consequence to the determination of the action. There was nothing of consequence with the wanted poster which bore Mr. Padilla's photo. And there was nothing of consequence to the action of Officer Fukai's testimony regarding his arrest of Mr. Padilla in Skid Row in the evening, several months after the robbery. Let's assume that for the moment. How does how is that prejudicial error given the picture of him in line in the bank? And I know he testified that he was there for various reasons, but the picture and the identification of him by the teller. How does the fact that there was a wanted poster that was, say, improperly introduced, and there was testimony about how he was arrested, how does that undermine your confidence in the verdict? Your Honor, I think that the defense attorney said it best. She said the only reason to want to introduce this evidence is to sort of make it look like there's actually a second ID. When what there is in this case is a single identification by a young teller, and that's all they have, besides the fact that he was in the bank. And that having the officer come in and say, look, I have this wanted poster. He's wanted for robbery. He's wanted for robbery. I have this wanted poster. I saw him. He was in Skid Row. I arrested him. It is in the nature of bringing in a second impermissible identification. Now, we can sit here as lawyers and judges and say, well, this was irrelevant, and so it shouldn't have had an impact on the jury. But I think that in a single eyewitness identification case, to bring in, you know, the imprimatur of the LAPD, although after the last argument maybe I shouldn't argue that. To bring in the imprimatur of having the LAPD. The sheriff's office. Oh, thank you. I'm glad to hear that. To bring that in and say, I looked at this crime photo. He was wanted for robbery. I saw him in Skid Row. I arrested him, I think was in a case where the evidence was not overwhelming, that this court should look at that and say it materially affected the verdict. Now, when you say it's not overwhelming and you sort of denigrate the young teller, I mean, she was pretty firm all along, wasn't she, that he was the guy? And she may believe that she's right. I don't in any way question that she believes that she was right. But we need to look at what happened in this case. She's robbed. She's not looking up. Her testimony is she's not looking up. She's approached. Someone says, give me your money. She looks up. This is a very stressful situation. The cases that have discussed the problems with eyewitness identification go into this in detail. You know, she looks up. She has a momentary, you know, he was in the bank. So this isn't just an off the street. That's right. He's in the bank. Your client admits he was in the bank. Absolutely. And your client admits that's who it is on the poster. Yes. But he certainly does not admit he's the one at the teller window robbing the teller, Your Honor. And that's the important question. Okay. So what were her identifications based on? So she looked down? What they did was they showed her the video. They showed her these incomplete videos and said, here, this is what we have. Look at this and tell us who the robber is. Okay. And you say they're incomplete. What do you mean they're incomplete? They do not show people standing at that teller window. But they show people in line, don't they? They do show people in line. But these, I think. Did she hesitate and say, well, it may have been that guy behind or this guy in front? No, but the complete universe of everyone who was in the bank that day is not shown in those videotapes. So we have no confidence that the actual robber was not photographed and left the bank without being photographed. And that was the main point, I believe, that the defense attorney tried to make as to why this. What's the record on when the video? What did the videotape capture those standing in front? What was one of these windy lines? And it could go to any number of tellers or it was lined up in front of her? I don't know if it was that there was only one teller window open, but the videotape moves back and forth. The videotape is not a constant stream of one perspective. It goes from the door to the vault. You know, there's like six different views, and it goes one, two. It's a jump video. And it does not have a view of the ATM machine, I don't believe. It does not have a chronological minute-by-minute view of the door. And so people could have gone in and out without showing up on that videotape. And that, I think, is if we had a continuous photo of everyone in the bank and then she identified him, maybe the evidence is stronger. But I think without that, the fact that she immediately, after having this stressful event, is shown a videotape and says that's him, she may truly believe that that's him. But I don't think that that is overwhelming evidence. I think that's fairly weak evidence. Did the videotape show everyone who was in that line for that teller? I may have to defer to my honorable colleague to answer whether that's exactly what that line is. It does show him moving up in the line. And there is no time thing that happened where they said, okay, the bank robbery happened at this minute, and this is what's going on at this minute. If it showed everyone moving up in the line, did it continue through the robbery? If it did, that is not how the evidence ñ there's no picture. There's no picture of the teller windows. So there's pictures of people in line. There's a picture of him in line. There's a picture of him not in line. There's no picture of him leaving the bank. There's no picture of what happens once he's not in line. So it doesn't show the picture of people at the window itself. Exactly. There's no evidence, I take it, that somebody cut in line and jumped the line. No. I suspect if somebody had, there might have been a little disruption. That's true. But the teller also testified she didn't see him come up to the window. And we don't have the evidence of what the other people in line may or may not have seen because the defense attorney couldn't investigate that because she had no field identification cards, which is, you know, related to the other issue raised in my brief. So I think in particular the combination in this case, in this Federal bank robbery case where my client's going to spend basically the rest of his life in prison, is fairly weak. And I think that in this case, maybe not in every single bank robbery case, in this case, the introduction of Officer Fukai's testimony and the wanted poster was sufficient to compel reversal. May it please the Court. Fred Riley, Jr. for the United States. The briefs in this case focused on one purpose for which the Crime Alert Bulletin was introduced at trial, and that was to show why Officer Fukui stopped and detained the dependent on October 4th. Was that an issue? Anybody contesting it? Well, Your Honor, I believe that the defense did not contest at trial that the defendant was at the bank. But it was introduced. It's important to note the Crime Alert itself was introduced for a second purpose, and that was to establish that the defendant was at the bank. Detective Martin testified that he showed the Crime Alert. Oh, wait. Was that in dispute? No. No, it wasn't, Your Honor. But what was in dispute was whether the defendant. And if he's on the videotapes from the bank, why does it have to come in then as a matter of a flyer which says wanted for robbery? If you had that foundational problem. Your Honor. As being in the bank, there were certainly other ways to prove it other than using the flyer, right? That's right, Your Honor. There were other ways of going about it. I believe that the Crime Alert was introduced through Officer Fukui to bridge two important pieces of evidence, and that was the initial identification of the bank robber from the surveillance videotape by the teller, and then two months later, the defendant's own identification of himself using the same Crime Alert as a person who was at the bank at the time of the robbery. So you have these two identifications that the government relied upon and argued, and what the government sought to do through Officer Fukui's testimony was to give context to them and to bridge them. The concern was that, was that without that testimony, the jury might have been. But I don't understand. This Crime Alert shows what? Pictures taken at the bank. Yes, Your Honor. So why didn't you introduce the pictures taken in the bank? Why did you introduce the pictures with a heading that says wanted for robbery? Your Honor, I believe the surveillance photographs, in fact, were introduced as separate exhibits. The government introduced the Crime Alert twice, once because it was, in fact, what Officer Fukui relied upon in stopping the defendant, and the second time was. What does that have to do with it? What difference does it make why he arrested him? What's the point? What does that have to do with the case? Judge Reinhart, I believe it is simply to give context to the identification that the defendant made of himself as being in the robbery, and then the much earlier identification by the teller. But you weren't satisfied that he said he was there. You had to prove he was there by putting wanted for robbery above the picture. Your Honor, I believe that the other, as you point out, the other surveillance photographs, there were other surveillance photographs available. Those surveillance photographs, in fact, were introduced. The Crime Alert was introduced because it was what the defendant used to identify himself. Detective Martin testified that he showed the defendant the Crime Alert, and the defendant said, that's me. It was the Crime Alert that was actually used. That's my reading of the record. Exhibit 9 was shown to the defendant, and the defendant said, that's me. Was that objected to? It was not, Judge Fischer. I believe that Exhibit 9, which is the Crime Alert, was objected to when it was introduced through Officer Fukui. But the second time, when Detective Martin testified about having shown the Crime      So I don't believe that that was the case at that point, and I don't believe defense counsel cross-examined Detective Martin about that. When was it moved in evidence and shown to the jury? Judge Fischer, it was moved into evidence the first time. So it was when it was introduced through Officer Fukui. And at that point, it was objected to. It was. But it already is. So objecting when Martin's looking at it is sort of what? Judge Fischer, it's an important point, though, because I think it shows that it would have come in anyway simply to establish that the defendant did identify himself through the Crime Alert as having been in there. Are you suggesting that the – if that had been kept out, that they would have not objected when Martin put it on? I'm not – I'm not suggesting that, Your Honor. I just can't know. You suggested it would come in in any event, and I don't buy that. I believe it would have come in for a couple of reasons. One, to the extent that the defendant identified – adopted specific information in the Crime Alert, for example, by pointing at the photographs and saying, that's me, he could be said to have adopted those photographs in a limited amount of time. There's no dispute about whether he was there by then in any event. There was no dispute, Your Honor. I believe the defense counsel in opening statement said that they did not dispute the defendant was in the bank. But the government still, I would point out, had the burden of establishing identity, and that really had two aspects here. The first is, is the defendant the person who's depicted inside the surveillance photographs? And then the second is, is that person the bank robber? And the fact that the defendant said, that's me, in looking at the surveillance photographs and then made conflicting statements, that was important evidence. And I would submit that that is evidence that in addition to the testimony of the teller, Ms. Portillo, establishes that any error that the district court might have made really was harmless. If there are no further questions, thank you. Thank you, counsel. I think that the fact that the poster says wanted for robbery is what makes it into something in the nature of a second identification. And that's all I have. Thank you, counsel. Thank you both. The case is here. It will be submitted. The Court will stand in recess for the day. All rise.
judges: Reinhardt, O'scannlain, Fisher